IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEAN WESSELS,                                    No. 3:14-cv-01329-HZ

          Plaintiff,

    v.

MOORE EXCAVATION, INC., d.b.a.                   OPINION & ORDER
MEI Group,

          Defendant.

Banafsheh Violet Nazari
NAZARI LAW
319 S.W. Washington Street, Suite 301
Portland, Oregon 97204

      Attorney for Plaintiff

Elizabeth A. Falcone
Amanda C. Van Wieren
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Center
222 S.W. Columbia Street, Suite 1500
Portland, Oregon 97201

      Attorneys for Defendant

1 - OPINION & ORDER

HERNANDEZ, District Judge:

Plaintiff Dean Wessels brings this disability discrimination action against his former employer, Defendant Moore Excavation, Inc. Defendant moves for summary judgment on Plaintiff's claims. Alternatively, Defendant moves for partial summary judgment on its "direct threat" affirmative defense. Because I agree with Defendant that Plaintiff fails to create an issue of fact as to causation and fails to show he requested a reasonable accommodation, I grant Defendant's motion. I deny the alternative partial summary judgment motion as moot.

BACKGROUND

Plaintiff was employed by Defendant, a construction firm which works on large projects, from May 3, 2013 until late October 2013. Roy Moore is Defendant's president. Plaintiff was hired as a heavy equipment operator. At the time, he had a preexisting knee injury. Unbeknownst to Defendant until after his employment with Defendant ceased, Plaintiff was being prescribed both oxycodone[1] and OxyContin[2] while working for Defendant.

During his time with Defendant, Plaintiff was assigned to different crews at different job sites. Each crew consisted of several operators and a foreman or a superintendent. Falcone Decl. Exs. A, B ("Pl. Dep.") 64; ECF 34-1, 34-2. Plaintiff was not a member of a union and his employment was at will. Id. at 73.

Within a few weeks of beginning his employment, Plaintiff re-injured his knee over Memorial Day weekend in a dirt bike accident. Id. at 27. At that time, he was working on the

---

[1] Oxycodone is an opiate pain medication. See
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html

[2] OxyContin is the brand name for a timed-release formula of oxycodone. See
http://www.drugs.com/oxycontin.html

"Rose City" job with superintendent George Wells. Id. at 40, 44. When the job was complete, Plaintiff was released back into Defendant's general labor pool to be reassigned. Falcone Decl. Ex. I ("Wells Dep.") 41; ECF 34-9. Plaintiff next worked for Mark Rolph on a project in Hood River, from June 6-24, 2013, and again from September 3-9, 2013. Falcone Decl. Ex. G ("Rolph Dep.") 22-25; ECF 34-7. He ran an excavator on this project and performed other tasks. Id. at 20, 25.

Plaintiff worked with superintendent John Nutter on a light rail project from June 26 to July 16, 2013. Falcone Decl. Ex. E ("Nutter Dep.") 30-31; ECF 34-5. On July 17, 2013, Plaintiff was moved to the "Minter Bridge" project with Scott Pellecer. Falcone Decl. Ex. F ("Pellecer Dep.") 50; ECF 34-6. Moore promoted Plaintiff to foreman while on that project, and he was given a phone and company vehicle to drive. Pl. Dep. 65-68. Plaintiff worked on this project from July 17 to August 28, 2013, and then again from September 10-18, 2013. Pellecer Dep. 84. Finally, at the time of his termination, Plaintiff was working for superintendent Brent Seipert on the "FedEx" project. Falcone Decl. Ex. H ("Seipert Dep.") 20, 37; ECF 34-8.

Defendant terminated Plaintiff on October 21, 2013. Pl. Dep. 102. Defendant asserts that its termination was based on Plaintiff's inability to work well with others. Plaintiff contends that his termination was motivated by his disability.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

3 - OPINION & ORDER

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

DISCUSSION

I. Plaintiff's Claims

Plaintiff brings a disability discrimination claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (ADA), based on his termination. He also brings separate ADA claims for the failure to accommodate and the failure to engage in the interactive process

regarding an accommodation.  He brings analogous claims under Oregon law.  Or. Rev. Stat. §§

(O.R.S.) 659A.103-659A.145.  The standards for analyzing the federal and state claims are the

same.  O.R.S. 659A.139 (state statute to be construed "to the extent possible in a manner that is

consistent with any similar provisions of the federal Americans with Disabilities Act"); Atwood

v. PCC Structurals, Inc., No. 3:14-cv-00021-HZ, 2015 WL 3606323, at *10 (D. Or. June 4,

2015) ("the Court uses the same analysis for Plaintiff's federal and state law disability

discrimination claims") (citing Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1087 (9th

Cir. 2001); Henderson v. Jantzen, Inc., 79 Or. App. 654, 719 P.2d 1322 (1986)).

II.  Evidentiary Objections

        Defendant raises numerous objections to evidence Plaintiff relies on in opposing

Defendant's motion.  Relevant objections are discussed below, in the context of the particular

issue in which the evidence is relied upon.  All other evidentiary objections are denied as moot.

III.  Disability Discrimination Claim

        The ADA and Oregon law prohibit discriminating against qualified individuals on the

basis of disability in the terms and conditions of their employment.  42 U.S.C. § 12112(a);

O.R.S. 659A.112(1).   To oppose summary judgment in a discrimination claim, Plaintiff has the

initial burden of making out a prima facie case of discrimination.[3]

        To establish a prima facie case of disability discrimination, Plaintiff must show that (1)

---

        [3]  While a plaintiff may oppose summary judgment in a disparate treatment claim by
providing direct evidence of discrimination, see Cornwell v. Electra Central Credit Union, 439
F.3d 1018, 1029-30 (9th Cir. 2006) (plaintiff may rely on either circumstantial or direct evidence
to defeat a motion for summary judgment in a civil action under Title VII), for the reasons
explained below, I reject Plaintiff's argument that his evidence of discriminatory intent is direct
evidence as defined by the Ninth Circuit.

he is disabled; (2) he is a qualified individual as defined in the statute; and (3) he suffered an adverse employment action because of his disability.  Smith v. Clark Cty. Sch. Dist., 727 F.3d 950, 955 (9th Cir. 2013).  If Plaintiff establishes a prima facie case of disability, the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), applies.  Snead, 237 F.3d at 1092-94 (applying the burden-shifting analysis of McDonnell Douglas to ADA claims of employment discrimination); see also Mayo v. PCC Structurals, Inc., 795 F.3d 941, 943 (9th Cir. 2015) ("We apply the familiar burden-shifting framework outlined in McDonnell Douglas . . . to claims under Oregon disability law").  The burden shifts to Defendant to provide a legitimate, non-discriminatory reason for the adverse employment action.  Curley v. City of N. Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014).  If Defendant does so, then the burden shifts back to Plaintiff to prove that the reason given by the employer was pretextual.  Id.

A.  Prima Facie Case

Defendant does not contest that Plaintiff is disabled under the ADA.  Defendant contends that Plaintiff cannot establish, or create an issue of fact regarding, the other two elements of a prima face case:  that he is otherwise qualified to perform the essential functions of his position and that Defendant terminated him because of his disability.

1.  Qualified Individual

A qualified individual with a disability is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); see also O.R.S. 659A.115 ("an individual is qualified for a position if the individual, with or without reasonable accommodation, can perform the essential functions of the position").  In making the

determination of whether a plaintiff is a "qualified individual with a disability" as defined, the

court "first examines whether the individual satisfies the requisite skill, experience, education

and other job-related requirements of the position." Samper v. Providence St. Vincent Med. Ctr.,

675 F.3d 1233, 1237 (9th Cir. 2012). Then, the court considers whether the individual can

perform the essential functions. Id. Defendant raises no issue as to whether Plaintiff had the

"requirements" for the position. Defendant contends that "safely" operating heavy equipment

was an essential function of Plaintiff's job and that Plaintiff cannot perform that essential

function.

The parties dispute whether "safely" operating heavy equipment was an essential function

of Plaintiff's job. Plaintiff argues that the safe operation of the equipment is a "qualification

standard" which a person does not need to meet to show that he is "qualified." Bates v. United

Parcel Serv., Inc., 511 F.3d 974, 990 (9th Cir. 2007). I need not resolve the dispute because even

assuming for the purposes of this Opinion that "safely" operating heavy equipment was an

essential function of Plaintiff's job, Defendant fails to establish the absence of material fact as to

Plaintiff's inability to perform that function.

Plaintiff does not dispute that while he was working for Defendant, he regularly took

opiod pain medications. Defendant did not know of this medication use during Plaintiff's

employment or at the time of termination. There is no evidence in the record indicating that

during Plaintiff's tenure, Defendant was concerned about Plaintiff's ability to safely operate the

equipment.[4]

---

[4] One of Plaintiff's supervisors thought Plaintiff operated an excavator in a manner that
was "not steady," meaning the motions were not "fluid and smooth." Nutter Dep. 38. He also
did not operate it quickly. Id. at 37, 38. Rolph also thought Plaintiff operated the excavator

In support of its argument that Plaintiff's opiod pain medication use prevents him from safely operating heavy equipment, Defendant relies on a snippet of Plaintiff's deposition testimony, taken out of context, and viewed, contrary to the appropriate standard on summary judgment, in a light most favorable to Defendant. There are two portions of Plaintiff's deposition testimony at issue as well as testimony by his treating pain specialist.

First, during his deposition, Plaintiff was questioned about his pain level during the relevant time, including being asked questions about a pain scale. His physician, Dr. Howard Grattan, explained that a "visual analogue pain scale" is used for patients to "self-report [] how much pain the patient is subjectively experiencing." Falcone Decl. Ex. D ("Grattan Dep.") 54; ECF 34-4. The scale goes from 0-10 with 0 meaning no pain and 10 being the worst pain. Id.

Plaintiff testified that his pain levels differed depending on the time of day and on his ability to avoid sitting for hours on end without being able to stand up. Pl. Dep. 164. His concentration was unaffected because his pain levels varied and he never experienced pain at a level of 9. Id. at 164-65. He could not recall ever operating equipment when his pain level was at an 8. Id. at 166.

He admitted that a 7 or 8 out of 10 was "pretty high" and that his pain as of May 17, 2013 was a 7 out of 10. Id. at 164. In describing the pain level of 7, he agreed that a 7 was a "significant irritant" and "irritating enough that he wanted the pain to go away." Id. at 165. Plaintiff did not know the definition of a 9 on the scale without looking at the information at the doctor's office that accompanies the scale. Id. at 166. He thought, without access to that

---

slowly. Rolph Dep. 21-22. The testimony does not indicate that either Nutter or Rolph were concerned about safety as a result of Plaintiff's equipment operation.

information, that a 9 was "unconsciousness and certain things like that." Id.  Plaintiff agreed that he could imagine a circumstance where someone was taking a sufficient amount of opiods that it was no longer safe for that person to operate a backhoe. Id. at 93.  And while Plaintiff explained that the pain was unpredictable so he did not know what level it would be when, and that he did not remain on a piece of heavy equipment for eight hours a day, he also did not know exactly what moment during the day he would need to get on a piece of equipment. Id. at 166-67.

Defendant argues that the evidence shows that Plaintiff experienced pain, unpredictably, at a 7 or 8 out of 10, and that Plaintiff believed a 7 was a high level of pain and that a level of 9 meant unconsciousness.  But, when all of Plaintiff's testimony on this issue is considered in the light most favorable to Plaintiff, the testimony establishes that Plaintiff experienced varying levels of pain, unpredictably, but that he never operated equipment when his pain was at level 8 or higher, his concentration was unaffected, he was unsure what a level 9 meant but thought it could be unconscious, and that a pain level of 7 was a "significant irritant."  Nothing else is a fair reading of the deposition testimony through the appropriate lens.

In his deposition, Dr. Grattan testified that a 7 out of 10 on the scale is "fairly significant pain, impairing the patient's ability to do activities or concentrate" and that an 8 out of 10 is "a bit worse than 7 out of 10." Grattan Dep. 54-55.  In deposing Dr. Grattan, Defendant's counsel made certain representations about Plaintiff's pain testimony.  Defendant's counsel told Dr. Grattan that Plaintiff "testified that an 8 of 10 pain level on the visual analogue scale meant to him that that was just one level lower than being unconscious due to pain; in other words, [Plaintiff] testified that a 9 out of 10 to him meant that you were so much pain, that you were unconscious." Id. at 57-58.  From there, Defendant's counsel asked Dr. Grattan whether it would be safe for Plaintiff

to operate heavy equipment while experiencing pain at a level of 7 out of 10, to which Dr.

Grattan responded that based on Plaintiff's belief that this was 2 levels below unconsciousness, it

would not be safe. Id. at 58.

Relying on Dr. Grattan's testimony, Defendant contends that the record establishes that

Plaintiff cannot safely operate heavy equipment while experiencing pain at a level of 7 or 8.  The

problem for Defendant is its reliance on a construction of Plaintiff's deposition testimony that

favors Defendant, not Plaintiff.  It was not entirely accurate to represent to Dr. Grattan that

Plaintiff testified that a pain level of 7 was 2 levels below unconsciousness when Plaintiff had

testified that a 7 was a "significant irritant," and that Plaintiff clearly did not know exactly what a

level 9 was without looking at the information in the doctor's office.  Defendant fails to credit

Plaintiff's testimony that he did not operate heavy equipment when his pain level was at an 8.

Additionally, the "pain level" argument fails to consider that Plaintiff's reports of pain were

presumably the level of pain he experienced without medication.  Given that he was taking opiod

medication while employed by Defendant, it is far from clear that Plaintiff regularly experienced

levels of pain of 7 while operating heavy equipment.  The foundation of Dr. Grattan's opinion

about safely operating heavy equipment with certain pain levels is without support in the record

when that record is interpreted in a light most favorable to Plaintiff.  Defendant fails to establish

an absence of fact on the question of whether Plaintiff could safely operate heavy machinery

when Plaintiff's pain level was inconsistently at a subjective level of 7.

Second, Defendant argues that it is undisputed that Plaintiff cannot safely operate heavy

machinery while taking his prescription opiod medications.  Defendant's argument, in short, is

that Dr. Grattan testified that it would be unsafe for Plaintiff to operate heavy equipment "while

he was taking five tabs of Oxycodone throughout his workday" and that it would be unsafe for

Plaintiff to operate heavy equipment, and contrary to Dr. Grattan's instructions, for Plaintiff to

take five tabs of Oxycodone before getting to work in the morning.  Grattan Dep. 47-50.

Defendant's counsel mischaracterized Plaintiff's testimony to Dr. Grattan during Dr.

Grattan's deposition and thus, the foundation for Dr. Grattan's opinion testimony is not based on

an interpretation of the evidence considered in a light most favorable to Plaintiff.  In questioning

Plaintiff, Defendant's counsel inquired about a July 2013 record from Dr. Grattan's office noting

a call from Plaintiff in which he reported that he "uses the five tabs of Oxycodone to get through

the workday" and that he desired something else to take at night for his pain.  Pl. Dep. 100.  The

relevant testimony is as follows:

> Q.  Can you think of any reason why you would call the Columbia Pain and Spine
> Institute and tell them that you were using five tabs per day of Oxycodone to get
> through the workday if that wasn't true?
>
> A.  Because I would take it before I would get to work.  I guess I -- I would -- I
> wasn't taking it while I was working.  I didn't want to -- and I'm -- I guess -- I was
> -- I don't even know how to word this.
>> Some of this was when I was -- before I was at MEI, so I'm trying to
>> remember.  But -- I don't even remember what Tramadol is, to be honest
>> with you.  I don't -- I don't even remember that medication.
>
>> But no, I was taking it before and after work.
>
> Q.  Well if we keep reading on Exhibit 13 [the chart note of July 10, 2013], it
> reads:  "Patient called to inform you that he uses the five tabs per day of
> Oxycodone to get through the workday.  He works up to 14 hours per day.  He is
> wanting to have something to be able to take at night for his pain.  Please advise."
>> When I read that it makes me think that you are asking for additional
>> medication to get through the night.  Am I -- does it sound like that to
>> you?
>
> A.  Yes.

Q.  Okay.  It is true that you were <u>taking five tabs of Oxycodone to get you through the workday</u> and then you wanted additional medication to take at night?

A.  Sure.  Yes.

Q.  Okay.  And this was in July of 2013.  True?

A.  Yes.

*  *  *

Q.  When it says in here "five tabs per day," do you understand that to mean five pills?

A.  Yes.

Pl. Dep. 100-01 (emphasis added).

When Defendant's counsel questioned Dr. Grattan, she asked whether Dr. Grattan would have cleared Plaintiff to work if he had known that Plaintiff was operating heavy equipment "while he was taking five tabs of Oxycodone throughout his workday[?]" to which Dr. Grattan replied, "No."  Grattan Dep. 47.  He also said it would not have been safe for Plaintiff to operate the equipment "while he was taking five tabs of Oxycodone throughout his workday[.]  <u>Id.</u> at 47-48.  Then, Defendant's counsel continued with Dr. Grattan by asking this question:

Q.  I will also submit to you that during Ms. Wessels' deposition, he testified that as of July 10th, 2013, he was not actually taking five tabs of Oxycodone spread out throughout his workday, but was taking all five tabs in the morning before he would get to work.
        Did Mr. Wessels ever discuss with you that he was taking all five tabs of Oxycodone in the morning before he would get to work?

<u>Id.</u> at 48.  Dr. Grattan answered "No" to this question and then testified that he would not have cleared Plaintiff to operate heavy equipment if Plaintiff was "taking all five tabs of Oxycodone less than five hours before he reported to work in the morning."  <u>Id.</u> at 48, 49-50.

Defendant's counsel misrepresented Plaintiff's testimony to Dr. Grattan when she indicated that he "was taking five tabs of Oxycodone throughout his workday."  Plaintiff's report to Dr. Grattan's office was that he was taking his five tabs of Oxycodone to "get through the workday."  The distinction between taking medication "throughout the day" and taking medication to "get through the day" is material.  While the former implies that the medication was taken continuously throughout the day, the latter carries no such implication.  Instead, it implies only that the individual needed medication to get through the day.  It does not necessarily suggest a time element as to when the medication was taken.  This is made more clear by Plaintiff's testimony that he "wasn't taking it while I was working," and that he took it "before and after work."  Construing the testimony in a light most favorable to Plaintiff, the deposition testimony does not show that he was taking five tabs of Oxycodone throughout his workday. Instead, it suggests that he was taking some before and some after work so he could make it through his day.  As a result, Dr. Grattan's testimony about whether Plaintiff could safely operate heavy equipment while taking five tabs of Oxycodone throughout the workday has no weight.

Additionally, Plaintiff's testimony was not that he took five tabs of Oxycodone on his way to work in the morning.  For this, Defendant relies only on the first words spoken by Plaintiff in response to the deposition question.  Defendant fails to consider the entire answer explaining that he took the medication both before and after work.  As Plaintiff notes in his Declaration, he was never asked in his deposition if he took five tablets of opiods all at once on his way to work.  Pl. Decl. ¶ 26.[5]  He asserts he took his medication as prescribed by Dr. Grattan.  Id.  Dr. Grattan's

---

[5]  Defendant moves to strike Paragraph 26 of Plaintiff's declaration as being inconsistent with his deposition testimony that he "would take [the Oxycodone] before I would get to work." For the reasons explained here, I overrule the objection because considering the testimony as a

testimony about Plaintiff taking five tabs of Oxycodone on his way to work is also without any weight.

Finally, Defendant's argument fails to consider any of Dr. Grattan's testimony about Plaintiff's use of opiod medications as prescribed. Dr. Grattan testified that if used appropriately, there were not a lot of studies showing that opiod use increased risks. Grattan Dep. 46. He opined that if Plaintiff took the opiod medications as prescribed, there was a chance he could have operated the relevant equipment safely. Id. at 46-47. He indicated Plaintiff's tolerance to the medication played a role. Id. at 46.

In summary on this issue, there is no testimony establishing exactly when Plaintiff took which of his two opiod medications other than Plaintiff's testimony that he took Oxycodone before and after work.[6] There is no evidence establishing how many he took before work or after, or at what time he actually took the medication. As a result, when the evidence is construed in a light most favorable to Plaintiff, Dr. Grattan's testimony about Plaintiff's ability to safely work after having taken five tabs of Oxycodone before work or five tabs throughout the day, is not relevant. Although it is Plaintiff's burden to show that he can safely perform the essential functions of his job, it is Defendant's burden on summary judgment to show an absence of material fact on that issue. Defendant does not meet that burden. Thus, for the purposes of this motion, I assume that Plaintiff is a qualified individual with a disability.[7]

---

whole and in context, the Declaration statements do not contradict the deposition testimony.

[6] Defendant's counsel acknowledged this in Dr. Grattan's deposition when she stated that Plaintiff "did not testify as to the timing." Grattan Dep. 49.

[7] I reject Defendant's argument that given that illegal drug users are not qualified individuals with a disability, it is entitled to summary judgment because Plaintiff was illegally

2.  Causation - Termination "Because of" Disability

If Plaintiff is a qualified individual with a disability, Plaintiff still must show that he was terminated because of his disability to establish his prima facie case of discrimination.

a.  Direct Evidence

Plaintiff contends that he has direct evidence of discriminatory motive.  He points to (1) his request for accommodation in requesting time off to attend doctor's appointments; (2) Moore's comment after terminating Plaintiff that Plaintiff should have rescheduled his doctor's appointment that day because it was a busy time for the company; and (3) the fact that in response to previous complaints about him, he was reassigned but not fired.  Pl.'s Resp. 36-37; ECF 39.

"Direct evidence" of discriminatory intent is "evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (internal quotation marks and brackets omitted).  "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1095 (9th Cir. 2005).  Examples include, in an age discrimination case, the decisionmaker's comment that the

---

using his pain medication.  As said above, the record does not support the assertion that Plaintiff took all five tabs of Oxycodone at once on his way to work.  And, Defendant relies on testimony that several months after it terminated Plaintiff, Plaintiff used all of his monthly amount of oxycodone in the first half of the month.  Because this occurred after he worked for Defendant, it is not relevant.  See Ambrose v. J.B. Hunt Transp., Inc., No. 3:12-cv-01740-HU, 2014 WL 585376, at *14 (D. Or. Feb. 13, 2014) (determining whether the plaintiff was a "qualified individual" required consideration of whether he "was able to perform the essential functions of the commercial truck driver position at the time of his termination[.]") (emphasis added).

plaintiff was "too damn old to do his job[.]" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (brackets omitted); see also Hoffman v. Caterpillar, Inc., 256 F.3d 568, 571, 576 (7th Cir. 2001) (in a disability discrimination case, the decisionmaker's statement that he denied an applicant job training because she had only one hand).

Under the controlling definition, an employee's request for time to go to doctor's appointments is not direct evidence of an employer's discriminatory intent. It shows that the employer had knowledge that the employee had to go to the doctor, but it does not establish that the employer even knew of a disability much less that the employer took action against the employee because the employee was disabled. Gogos v. AMS Mech. Sys., Inc., No. 13 CV 3779, 2015 WL 6407834, at * 2 (N.D. Ill. Oct. 21, 2105) (employer's knowledge that employee was going to see a doctor and had done so in the past is not evidence suggesting that the employer knew the visit was for treatment of a protected disability). And, even if the employer knew the employee had a disability and was going to the doctor for treatment of that disability, the factfinder is still required to infer unlawful motivation based on that knowledge. This is not direct evidence.

As to Moore's comment, Moore made the decision to terminate Plaintiff and terminated him. Moore Decl. ¶ 2. In his deposition testimony, Moore states that none of his employees talked to him about Plaintiff's requests for time off for doctor's appointments. Falcone Decl. Ex. C ("Moore Dep.") 86-87; ECF 34-3. He was otherwise unaware of Plaintiff's requests to take time off for doctor's appointments. Id. at 88-89. He was unaware that Plaintiff had any physical difficulties at work. Id. at 88. He was unaware that Plaintiff had requested rides around the work site or to or from the work site. Id. He was unaware of communications by others with Plaintiff

regarding resolving any issues related to his physical difficulties at work.  Id. at 89.

According to Moore, Plaintiff had difficulty getting along with others and, after having moved him from one crew to another in an attempt to find a group he could work well with, Moore fired him.  Moore Decl. ¶ 2.  Moving Plaintiff to different job sites was not because of Plaintiff's requests for time off for doctor's appointments, of which Moore was unaware.  Moore Dep. 88-89, 91.  On the day of Plaintiff's termination, Brent Seipert told Moore that Plaintiff was not getting along with people again.  Id. at 84.  In order to talk to Plaintiff, Moore asked Seipert exactly where Plaintiff was on the large job site.  Id.  In response, Seipert told Moore that Plaintiff was at a doctor's appointment.  Id.  Moore told Seipert to tell Plaintiff to come to the office when Plaintiff returned because Moore wanted to talk to him.  Id.  When Plaintiff came to Moore's office, Moore fired him because "he'd been through just about all of the superintendents, and it was -- he was at the end of the -- end of the line."  Id.

Plaintiff testified in deposition that Moore met with him in a conference room and no one else was present.  Pl. Dep. 103.  He could not remember anything about the conversation with Moore other than "you're fired" or "you're terminated."  Id. at 103-05.  In his Declaration, he states that after meeting with Moore, he walked to his car and discovered he had not returned the company cell phone.  Pl. Decl. ¶ 19.  He walked back to the office to return the phone and saw Moore outside of the conference room.  Id.  Plaintiff thanked Moore for the opportunity to allow him to work for him.  Id.  Plaintiff alleges that Moore responded by stating that Plaintiff should have rescheduled his doctor's appointment because there was way too much work going on.  Id.  Plaintiff contends this statement is direct evidence of discriminatory motive.

Defendant objects to the admission of the statement because it contradicts Plaintiff's prior

deposition testimony.  Under the Ninth Circuit's "sham" affidavit rule, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991).  The  rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony.  Id. at 266-67.  The rule is concerned with "sham" testimony that flatly contradicts earlier testimony in an attempt to "create" an issue of fact and avoid summary judgment.  Id. at 267.  Before applying the sanction of striking affidavit or declaration testimony which contradicts prior deposition testimony, the district court must make a factual determination that the contradiction was actually a "sham."  Id.  Cases have emphasized that the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.  Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998-99 (9th Cir. 2009). Thus, "elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." Id. at 999 (internal quotation marks and brackets omitted).

In Yeager v. Bowlin, 693 F.3d 1076 (9th Cir. 2012), the court struck the plaintiff's declaration under the "sham affidavit" rule when during his deposition, the plaintiff responded that he did not recall answers to approximately 185 different questions, including questions on topics central to the case. Id. at 1079, 1080.  Yet, his declaration, submitted three months later, contained many facts that he could not remember at the deposition. Id. at 1079.  The Ninth Circuit noted that in his declaration, the plaintiff provided no reason for his "sudden" ability to recall specific facts that he could not previously recall other than stating that since his deposition,

he reviewed several documents which refreshed his recollection. Id. at 1080. The district court found this explanation unbelievable as the plaintiff had been shown over twenty exhibits during his deposition in an attempt to refresh his recollection. Id.

The Ninth Circuit cited to several of its cases which "indicate that a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember." Id. at 1081 (citing cases). The court cautioned, however, that newly-remembered facts or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham. Id.

Here, Defendant cites to three allegedly contradictory statements in Plaintiff's deposition:

Q.  . . . other than what you've already told me, which is that you recall being told you were fired, do you remember anything else at all that Mr. Moore said to you during the conversation where you learned you were being let go?

A.  I'm -- I'm sorry, I can't remember.

Pl. Dep. 104-05. Given that the alleged comment about rescheduling the doctor's appointment was made when Plaintiff returned to turn in his phone which was just after the conversation when Moore terminated Plaintiff, the Declaration does not contradict the deposition testimony in response to a question about what Moore said to Plaintiff during the termination conversation.

Next, Defendant relies on the following deposition testimony from Plaintiff:

Q. . . . Did you ever hear anyone at MEI make any negative comments about the fact that you'd requested an accommodation?

A.  I can't remember.

Q. Okay.  Did you ever learn secondhand, or from any other source, that someone at MEI had made negative comments about the fact that you had requested an accommodation?

19 - OPINION & ORDER

A.  I can't remember.

Id. at 56.

Q.  Did you tell the [Bureau of Labor and Industries (BOLI)]  investigator that you did not know if Roy knew that you needed an accommodation for these things, meaning time off, or not?

A.  I'm sorry.  Can you ask it again?  Was I truthful?  Is that what you said?

Q.  Did you tell the BOLI investigator that you did not know if Roy knew that you needed an accommodation for these things or not?

A.  I believe I did, yes.

Q.  Was that a truthful statement that you made to the BOLI investigator?

A.  Yes.

Id. at 296-97.

Moore's alleged comment to Plaintiff about rescheduling a doctor's appointment is a "negative comment" by Moore about Plaintiff's request to go to the doctor which Plaintiff himself characterizes as a reasonable accommodation request.  Given that Plaintiff previously said in deposition he could not remember anyone making a negative comment about an accommodation request or could not remember ever learning from anyone that someone had made a negative comment about an accommodation, Plaintiff's Declaration statement about what Moore allegedly said is contradictory.  And, as to the second of these two deposition excerpts, given that Plaintiff told the BOLI investigator that he did not know if Moore knew Plaintiff needed an accommodation and Plaintiff confirmed the truthfulness of this statement at his deposition, his Declaration is contradictory.  When Moore allegedly told Plaintiff that Plaintiff should have rescheduled his doctor's appointment, Plaintiff learned then that Moore knew that Plaintiff had

needed an accommodation in the form of time off to go to the doctor's appointment.

Plaintiff offers no reason in his Declaration for why he remembers Moore's statement now as opposed to when he was questioned at deposition. Given that the comment occurred just after his termination and that he believes it is direct evidence of discriminatory animus, this comment is central to Plaintiff's case. The statement in the Declaration is not an elaboration upon or an explanation or clarification of the deposition testimony. For these reasons, I find that the statement in Plaintiff's Declaration at Paragraph 19 regarding what Moore said about rescheduling his doctor's appointment is a sham. It is stricken.

Alternatively, even if this statement is considered, it is not direct evidence of discriminatory motive. The statement requires the factfinder to infer that Moore knew that Plaintiff needed to go to the doctor because of a disability as opposed to some other non-disability related reason. There is nothing in Moore's statement suggesting he knew why Plaintiff went to the doctor that day.

Finally, as to direct evidence, Plaintiff argues that the fact that Moore terminated him after Seipert complained to Moore but did not terminate him after previous complaints by other superintendents, shows that Moore's learning that Plaintiff had gone to the doctor was the motivating factor behind the termination. For the reasons previously explained, however, Moore's different treatment on this occasion with the newly possessed knowledge that Plaintiff went to the doctor is not direct evidence of discrimination because the factfinder must still infer discriminatory intent from Moore's knowledge of a doctor's appointment.

b. Circumstantial Evidence

Even if there is no direct evidence of discriminatory animus, Plaintiff argues that there is

circumstantial evidence of such motive.  From the briefing, it appears that Plaintiff relies on the

following evidence: (1) Moore's comment about rescheduling his doctor's appointment; (2) a

comment by Pellecer, one of Plaintiff's supervisors, that Plaintiff needed to hurry up while

getting into an excavator; (3) failure to follow a progressive discipline policy; (4) the fact that

when Moore received prior complaints about Plaintiff he transferred him, but he terminated him

in response to Seipert's complaint after learning he was at a doctor's appointment; (5) the fact that

Moore terminated him within hours of learning he was at a doctor's appointment; and (6)

excluding Plaintiff from the schedule after taking time off for doctor's appointments.  I address

these arguments in turn.

> i.  Moore's Comment about Rescheduling Doctor Appointment

For the reasons discussed above, the statement in Plaintiff's Declaration about what

Moore said is stricken under the sham affidavit rule.  However, even if I were to consider it, it

does not provide circumstantial evidence of discriminatory intent absent any evidence that Moore

knew why Plaintiff went to the doctor that day.  I agree with Defendant that an inference of

disability discrimination cannot be made from Moore's single reference to a doctor's appointment

when there is no evidence that Moore knew anything about Plaintiff's knee condition and thus,

did not know about his disability.  The doctor's appointment could have been for many reasons

unrelated to disability.  Gogos, 2015 WL 6407834, at * 2 (employer's knowledge that employee

was going to see a doctor and had done so in the past is not evidence suggesting that the

employer knew the visit was for treatment of a protected disability).  Moreover, Moore had

actually already terminated Plaintiff when he made this statement so it carries even less weight.

Even though an employment discrimination Plaintiff needs "minimal" evidence at the prima facie

case stage, e.g., Palmer v. Pioneer Associates, Ltd., 338 F.3d 981, 984 (9th Cir. 2003)

(establishing prima facie case "in response to a motion for summary judgment requires only

minimal proof and does not even need to rise to the level of a preponderance of the evidence")

(internal quotation marks omitted), reasonable jurors could not infer from Moore's comment

about rescheduling the doctor's appointment that his decision to terminate Plaintiff was

motivated by Plaintiff's disability.

### ii.  Pellecer's Comment

Plaintiff testified in deposition that when Plaintiff worked with Pellecer, Pellecer made a

joke that Plaintiff needed to hurry up while getting into an excavator.  Pl. Dep. 53-54.  Plaintiff

testified that he couldn't recall specifically what Pellecer said, but Plaintiff "construed it as more

of a joke."  Id. at 53.  Plaintiff was not offended.  Id. at 54.

Plaintiff argues that Pellecer's comment establishes that Defendant was on notice that he

had a disability because his problem getting into the excavator was "visual" evidence of a

limitation.  That may be true, but this comment alone shows only that Pellecer observed

something about Plaintiff that caused him to "joke," and is not evidence that Moore, the

undisputed decisionmaker, knew of a disability.

Ninth Circuit cases hold that a "stray remark" that is "uttered in an ambivalent manner

and is not tied directly to [the plaintiff's] termination" is not direct evidence of discrimination.

Godwin, 150 F.3d at 1221.  Thus, for example, in an age discrimination case, the court held that

when commenting on an employment selection, a supervisor's observation that the selection was

a "bright, intelligent, knowledgeable young man," constituted a stray remark and, without more,

did not adequately demonstrate discrimination.  Merrick v. Farmers Ins. Grp., 892 F.2d 1434,

1438-39 (9th Cir.1990).  In another age discrimination case, the Ninth Circuit held that a comment to the plaintiff that "[w]e don't like grey hair," although more than the stray remark in Merrick, was not tied directly to the plaintiff's termination.  Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993).  The court held that this comment "is at best weak circumstantial evidence of discriminatory animus. . . ."  Id.  Similarly, in a gender discrimination case, Judge Haggerty held that although the defendant's single use of the term "bitch" had a "gender-specific connotation," it was "not so strong as to establish that [the defendant], by uttering the word, harassed plaintiff because of her gender."  Martinez v. Mary's Woods at Marylhurst, Inc., CV–05–437–HA, 2006 WL 1360946, at *6 (D. Or. May 16, 2006).

Moreover, the "cat's paw" theory requires evidence not only that Pellecer's statement reveals his own bias but that he influenced Moore, the final decisionmaker.  See Willis v. Marion Cty. Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997) (explaining that "there are situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate.").

In the Ninth Circuit,

if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking progress.

Poland v. Chertoff, 494 F.3d 1174, 1182 (9th Cir. 2007).

Even assuming Pellecer's remark evidences his own discriminatory animus, there is no

evidence that Pellecer influenced Moore's decision to terminate Plaintiff.  Without such evidence,

Plaintiff cannot create an inference of causation.  France v. Johnson, 795 F.3d 1170, 1176 (9th

Cir. 2015), as amended on reh'g (Oct. 14, 2015) (discrimination plaintiff cannot rely on a biased

subordinate's conduct to show causation unless "the biased subordinate influenced or was

involved in the decision or decisionmaking process.") (internal quotation marks omitted).

While there is evidence that Pellecer complained to Moore about Plaintiff's work, there is

no evidence that Pellecer communicated any bias to Moore, or told Moore about Plaintiff's knee

injury, his doctor's appointments, or anything else suggesting that Pellecer's bias infected Moore's

decision.  Plaintiff's argument is based on supposition:  he supposes that because Pellecer talked

to Moore about Plaintiff, he must have talked to him about Plaintiff's disability.  But, the

possibility that such a conversation could have occurred does not give rise to a reasonable

inference that it did in fact occur.  Cafasso ex rel. U.S. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d

1047, 1061 (9th Cir. 2011) (plaintiff's "cat's paw" type evidence established "only that this set of

events could conceivably have occurred; it does not give rise to a reasonable inference that it did

in fact occur"; court noted that finding "liability on this evidence would require undue

speculation").  "To survive summary judgment, a plaintiff must set forth non-speculative

evidence of specific facts, not sweeping conclusory allegations."  Id.  Pellecer's comments do not

create an inference of causation.

### iii.  Progressive Discipline

Plaintiff suggests that Defendant's failure to tell Plaintiff during his employment that he

was not fitting in is evidence of discrimination.  Pl. Resp. 8, 23.  But, in the absence of evidence

showing that Defendant had a regular practice or a policy of giving warnings or had some sort of

25 - OPINION & ORDER

progressive discipline system, this evidence does not give rise to an inference of discriminatory

motive.  Plaintiff has no evidence of such policy or practice, he has no evidence of similarly

situated non-disabled employees being treated differently, and he himself testified that he was

never told that he was entitled to a certain number of warnings before termination and that he

could be fired without any prior warnings.  Pl. Dep. 266-67.

### iv.  Prior Transfers to New Crew

Plaintiff argues that discriminatory animus is evidenced by Moore's treating him

differently than Moore had treated him in the past after learning that Plaintiff went to a doctor's

appointment.  At least three superintendents complained to Moore about Plaintiff.  Moore Dep.

23-24 (Nutter told Moore that Plaintiff thought Plaintiff was better than other people at operating

a piece of equipment and that Nutter was concerned about Plaintiff's ability to operate machinery;

Moore did not terminate Plaintiff at the time because he wanted to give him a chance to get

better); 25-26 (Pellecer told Moore that he thought Plaintiff lied about what he did on a particular

job site; Moore did not fire Plaintiff because he was "trying to give this guy a shot" because in

Moore's opinion, he was an adequate operator); 27-28 (Seipert told Moore that Plaintiff had a bad

attitude and he was causing trouble with the crew).  Nutter asked Moore to move Plaintiff to

another project.  Nutter Dep. 69.  Pellecer asked Moore to move Plaintiff off of his project.

Pellecer Dep. 85.  Seipert also told Moore that he did not want Plaintiff on his job anymore.

Seipert Dep. 22; Moore Dep. 27-28, 120.

In response to Nutter and Pellecer's complaints, Moore transferred Plaintiff to different

crews.  Moore Decl. at ¶ 2.  However, in response to Seipert's complaint, Moore fired Plaintiff.

Id.  Moore explains that he terminated Plaintiff this time because he had already moved Plaintiff

26 - OPINION & ORDER

to various crews and job sites to see if he could fit in with different crews and he had concluded, after receiving complaints from three superintendents, that Plaintiff had "repeatedly failed to work [well] with others." Id.; Moore Dep. 84 (stating that Plaintiff had reached "the end of the line").  Plaintiff points out that after hearing Seipert's complaints but before acting on them, Moore had learned from Seipert that Plaintiff had gone to a doctor's appointment.  Thus, he argues, this raises the inference that Moore terminated Plaintiff because of the doctor's appointment, not because of Plaintiff's work-related problems.

As stated previously, Moore's knowledge of a doctor's appointment is not knowledge of a disability.  It remains undisputed that Moore did not know of Plaintiff's knee injury, did not know of his doctor's appointments related to the knee injury, and did not know that the doctor's appointment on the day of termination was related to the knee injury.  Even assuming that Moore terminated Plaintiff in response to the doctor's appointment, that does not establish an inference of motive based on disability.

### v. Timing

Plaintiff argues that the timing between Moore's learning of his doctor's appointment and his termination is evidence of causation.  Causation may be inferred based on timing.  Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 507 (9th Cir. 2000).  However, again, evidence that Moore acted shortly after learning that Plaintiff went to the doctor for an unspecified reason, is not enough to create an inference of disability-based discrimination.

### vi. Exclusion After Doctor's Appointments

In the fact section of his Response, Plaintiff states that his request for time off for doctor's appointments was honored only once, on the day he was fired.  Pl. Resp. 6-7.  He explains that

all of his other requests for a few hours off resulted in being excluded from the schedule for one or more workdays following the time-off request. Id. In support of this assertion, he relies on his Declaration where he states that "[w]hen I had a doctor's appointment during work hours I only asked for a couple hours off so I could work the rest of the day. Except for October 21, the day I was fired, I was forced to take the whole day off and sometime additional days off each time I asked for time to attend a doctor's appointment." Pl. Decl.¶ 5.

In my reading of Plaintiff's Response, I find no further reference to these assertions and no argument based upon them. If these assertions are intended to evidence discriminatory intent in the termination decision, they fail to do so without additional evidence showing that similarly situated but non-disabled individuals were treated differently. It may be that given the nature of the work performed by Defendant, partial days are not tolerated. While that might be an extreme policy, it is not by itself suggestive of discrimination and thus, without comparator evidence, Plaintiff's allegations do not create an inference of discriminatory intent.

These allegations may support some sort of retaliation claim. It is possible they could form the basis of a claim that Plaintiff was retaliated against for exercising his right to reasonable accommodation in the form of a doctor's appointment. There is no dispute that Defendant allowed Plaintiff the time off for going to the doctor. See Pl. Resp. at 32 (noting "Defendant's act of allowing [Plaintiff] time off to attend doctor's appointments"). Thus, the issue may be more appropriately framed as whether Defendant's alleged act in forcing Plaintiff to take off the entire day or more than one day, was in retaliation for taking off for the doctor's appointment.[8] But,

---

[8] It is also possible that this could form the basis of a retaliation claim under the federal Family Medical Leave Act or the state Oregon Family Leave Act.

there is no retaliation claim asserted in this case.  And, even if there were, there is no argument or

supporting evidence that forcing the time off was an adverse employment action.  Thus, the

assertion that Defendant required Plaintiff to take off an entire day or more than one day on a day

he had a doctor's appointment is not suggestive of discriminatory intent in the termination

decision and is not otherwise relevant to the claims at issue in this case.

For the reasons explained, the evidence Plaintiff relies on fails to reasonably imply that

Moore's termination of Plaintiff was motivated by Plaintiff's disability.  However, for the

purposes of this Opinion, I will assume that collectively, the evidence is enough to meet

Plaintiff's burden at the prima facie case stage.  Thus, I proceed to consider the next steps of the

McDonnell Douglas analysis.

B.  Legitimate, Nondiscriminatory Reason

Plaintiff concedes that Defendant presents evidence of a legitimate, nondiscriminatory

reason for its actions - Plaintiff's inability to work with others.

C.  Pretext

A plaintiff may demonstrate pretext in either of two ways: (1) directly, by
showing that unlawful discrimination more likely than not motivated the
employer; or (2) indirectly, by showing that the employer's proffered explanation
is unworthy of credence because it is internally inconsistent or otherwise not
believable.  Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1127
(9th Cir. 2000). . . . Where evidence of pretext is circumstantial, rather than direct,
the plaintiff must produce "specific" and "substantial" facts to create a triable
issue of pretext.  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th
Cir.1998).  But see Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018,
1029–31 (9th Cir. 2006) (questioning the continued viability of Godwin after
Desert Palace, Inc. v. Costa, 539 U.S. 90, 100, 123 S. Ct. 2148, 156 L.Ed.2d 84
(2003)). That standard is "tempered" by our observation that a plaintiff's burden to
raise a triable issue of pretext is "hardly an onerous one." Noyes, 488 F.3d at 1170
(quoting Payne v. Norwest Corp., 113 F.3d 1079, 1080 (9th Cir. 1997)).

Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112-13 (9th Cir. 2011).

First, Plaintiff cannot rely on Pellecer's comment about his being slow getting into the excavator to show pretext. Mondero v. Salt River Project, 400 F.3d 1207, 1213 (9th Cir. 2005) ("[s]tray remarks not acted upon or communicated to a decision maker are insufficient to establish pretext").

Second, as stated previously, Moore had no knowledge of a preexisting knee injury, no knowledge of the Memorial Day weekend re-injury, no knowledge of requests for time off for doctor's appointments (for any reason), and no knowledge that Plaintiff had asked for rides around the work site. Because a plaintiff must show that he or she was discriminated against because of a disability, "[i]t follows that the plaintiff must show that the defendant had knowledge of his disability when making the adverse employment decision." Davis v. Con-Way Freight, Inc., No. 3:14-cv-01389-HZ, 2015 WL 5834156, at *7, *9(D. Or. Oct. 4, 2015) (further remarking that "without evidence that the decision-maker had knowledge of the disability, the determination to terminate an employee could not have been made because of that disability, as required by the ADA") (citing Hedberg v. Ind. Bell Tel. Co., Inc., 47 F.3d 928, 932–33 (7th Cir. 1995)), appeal filed, (9th Cir. Nov. 4, 2015). Thus, Plaintiff cannot rely on Moore's knowledge of his doctor's appointment on the day of termination because without knowledge of a disability, knowledge of the appointment does not suggest discriminatory motive. And, even if I consider Moore's post-termination remark about rescheduling that doctor's appointment, the comment also fails to show that Moore knew why Plaintiff was at the doctor that day and without any evidence that Moore knew about Plaintiff's disability, this cannot establish pretext.

Third, Plaintiff notes that he walks with a limp and thus, Moore should have known he

had a disability.  Pl. Decl. ¶ 3 (since injuring his knee in 2002, Plaintiff has walked with a limp);

Catalano Decl. ¶ 4 (Plaintiff has a knee injury and walks with a limp).  Moore denies he observed

Plaintiff with a limp.  Moore Dep. 28, 33 (Moore interviewed and hired Plaintiff and observed

him in the workplace, but never saw him limp).  No one else saw him limp either.   Seipert Dep.

48-49; Nutter Dep. 22-23; Pellecer Dep. 65; Rolph Dep. 27; Wells Dep. 44.

On summary judgment, taking the evidence in a light most favorable to Plaintiff, I accept

that he walks with a limp.  There still is no evidence in the record that the limp is pronounced

and easily observable by others.  There is no evidence that Plaintiff discussed the limp with

anyone, particularly with Moore.  Even if the limp were obvious, that alone does not establish a

disability.  See, e.g., Hodson v. Alpine Manor, Inc., 512 F. Supp. 2d 373, 392-93 (W.D. Pa.

2007) (even assuming that the plaintiff's back pain and limp establish that she had a disability

within the meaning of the ADA, no evidence that employer knew she was disabled or perceived

her as disabled); Semien v. Packaging Unlimited, LLC, No. 3:12-cv-00643-H, 2014 WL

3508681, at *5-7 (W.D. Kty. July 15, 2014) (assuming that the plaintiff had a noticeable limp,

court nonetheless remarked that "an individual may limp for a variety of reasons, many of which

would not support a disability as defined in the ADA"; further assuming that the defendant

should have known of Plaintiff's disability, court granted defendant's summary judgment motion

because plaintiff failed to establish pretext); Donoghue v. Moran Foods, Inc., No. Civ. A. 02-

1516SLR, 2003 WL 22466162, at *4 (D. Del. Oct. 29, 2003) (awareness of employee's limp not

enough to show employer regarded him as disabled) (citing Kelly v. Drexel Univ., 94 F.3d 102,

109 (3d Cir. 1996)); see also Fodor v. E. Shipbuilding Grp., 598 F. App'x 693, 695-96 (11th Cir.)

(terminated employee who walked with a limp and brought ADA claim failed to demonstrate that

31 - OPINION & ORDER

former employer's non-discriminatory reasons for failing to promote and for terminating him were pretextual), cert. denied, 136 S. Ct. 146 (2015), and reh'g denied, 136 S. Ct. 576 (2015).

Accordingly, the fact that Plaintiff walks with a limp is not specific and substantial evidence refuting Defendant's non-discriminatory reason for terminating him. When all of the evidence is considered, it either fails to create an inference of causation or fails to amount to specific and substantial evidence that Defendant's legitimate non-discriminatory reason for the termination was a pretext for disability-based discrimination. I grant summary judgment to Defendant on Plaintiff's discrimination claim.

IV.  Interactive Process & Reasonable Accommodation Claim

Plaintiff brings separate claims for failure to engage in the interactive process and failure to reasonably accommodate his limitations. There is a split among Judges in this District about whether the former is a stand-alone claim. In November 2014, I adopted a Findings & Recommendation of Judge Papak's which concluded that it is not. Dean v. Safeway, Inc., No. 3:12-cv-01875-PK, 2014 WL 6473543, at *16-17 (D. Or. Nov. 18, 2014). For the reasons explained by Judge Papak, I dismiss the failure to engage in the interactive process claim as a stand-alone claim and consider the interactive process allegations as part of the reasonable accommodation claim.

An employer has an affirmative duty to provide reasonable accommodations to individuals with disabilities. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). Once an employer becomes aware of the need for accommodation, that employer is obligated to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001). The

employer's awareness of the need for accommodation triggers the subsequent duty to discuss the appropriate accommodation with the employee.

The trigger may come from a request by the employee or by the "employer's recognition of the need for such an accommodation, even if the employee does not specifically make the request." Brown v. Lucky Stores, Inc., 246 F.3d 1182, 1188 (9th Cir. 2001). A request from the employee need not be in writing and the employee does not need to use particular wording or the term "accommodation." Roloff v. SAP Am., Inc., 432 F. Supp. 2d 1111, 1119 (D. Or. 2006) ("The law is clear that a plaintiff does not need to use any magic words to initiate the interactive accommodation process with his or her employer.") (citing Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1222 (9th Cir.2000) ("'An employee requesting a reasonable accommodation should inform the employer of the need for an adjustment due to a medical condition using 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'") (internal quotation marks omitted), vacated on other grounds by 535 U.S. 391 (2002)).

Nonetheless, the "general rule" is that the employee generates a request in some form. The Brown court explained that

> [t]he exception to the general rule that an employee must make an initial request applies, however, only when the employer "(1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation." [Barnett, 228 F.3d at 1112] (citation omitted). Barnett went on to explain that the employer is required to initiate the interactive process only when "an employee is unable to make such a request" and "the company knows of the existence of the employee's disability." Id. at 1114.

Brown, 246 F.3d at 1188.

In support of its motion, Defendant argues that Plaintiff's accommodation claim fails

because he never communicated a need for accommodation and Defendant was unaware of any

need for accommodation, other than Plaintiff's need to go to the doctor which Defendant allowed

without question.  I agree with Defendant.

Plaintiff stated at deposition that he never submitted any medical documentation to

Defendant providing any restrictions on his ability to work or about his knee injury generally.  Pl.

Dep. 39.  He also testified that he never communicated to anyone with Defendant that he had

restrictions on his ability to work due to his knee injury.  Id.; see also id. at 45 (Plaintiff testified

that he never gave Pellecer any information about any limitations or medical restrictions that the

knee injury created); Wells Dep. 35-36 (Plaintiff never told Wells his knee bothered him enough

to require light duty or asked to be put on light duty or said he had limited work performance).

In his Declaration, Plaintiff states that when he returned to work from Memorial Day

2013 after re-injuring his knee, he told Wells and foreman Anthony Koop that he was having

pain in his knee and leg, was limited in his ability to climb and walk, and was on pain

medication.  Pl. Decl. ¶ 11.  Defendant argues that this statement is inconsistent with his

deposition testimony.  As noted above, Plaintiff testified that he never communicated to anyone

that he had restrictions on his ability to work due to his knee injury.  As to Wells and Koop, he

was specifically asked these questions and answers:

Q.  What did you tell [Wells about your knee]?

A.  That I was involved in an incident and that I had re-injured my leg and that the
extent wasn't 100 percent known yet because I had follow-up appointments.

Q.  What else did you tell Mr. Wells about your knee injury?

A.  I don't remember.

* * *

Q. Do you recall anything specific that you and Mr. Wells discussed about the effects of your knee injury after the initial conversation when you returned from the Memorial Day Weekend?

* * *

A. I don't remember.

Pl. Dep. 40-41, 42-43.

Q. So you told Tony the pipe foreman about the reinjury to your knee the day you returned to work from Memorial Day Weekend 2013; is that right?

A. Yes.

Q. Okay. And what did you tell Tony?

A. That I had injured my leg, that I would have to go to the doctor again.

* * *

Q. Okay. After that initial conversation where you told Tony, when you came back from the holiday weekend, that you'd re-injured your knee and that you had to go to the doctor, do you recall having any other conversation with Tony about your knee injury?

A. I'm sorry, I don't remember that either.

Id. at 43-44.

Information provided by Plaintiff to Wells and Koop, or anyone else with Defendant, about any actual problems he had in performing a work-related function, are central to Plaintiff's reasonable accommodation claim. Yet, Plaintiff offers no explanation in his Declaration for why he now remembers telling Wells and Koop that he was limited in his ability to climb and walk but could not recall this at his deposition. As such, I find that the statement in the Declaration that he told Wells and Koop that he was limited in his ability to climb and walk to be a "sham"

35 - OPINION & ORDER

and I grant Defendant's motion to strike that statement.  As to the "pain medication statement,"

his deposition testimony was:

> Q.  Did you ever tell anyone at MEI that you were taking opiods while operating
> the company's heavy equipment?
>
> A.  I don't think so.  I don't -- I don't know.  I don't think so.

Id. at 96.  To the extent his Declaration is understood as having told Wells and Koop that he was

taking opiod pain medication while being assigned duties of operating heavy equipment, it is

stricken as inconsistent sham testimony.  As a result of striking this evidence, there is no

evidence in the record establishing that Plaintiff told anyone with Defendant that his knee injury

caused work-related limitations.

Plaintiff did tell his supervisors on the various projects he worked on that he had injured

his knee and needed time to go to the doctor.  But, as the Eastern District of Washington

explained in a 2013 case,

> an employee may not simply inform her employer that she suffers from a
> disability and assume that the employer will discover (and subsequently
> accommodate) each and every limitation caused by the disability.  To trigger the
> employer's duty to engage in the 'interactive process,' the employee must inform
> the employer of both the disability and the resulting limitations.

Kelley v. Amazon.com, Inc., No. 12-cv-5132-TOR, 2013 WL 6119229, at *5 (E.D. Wash. Nov.

21, 2013) (discussing U.S. Equal Emp't Opp'y Comm'n, The Americans with Disabilities Act:

Applying Performance and Conduct Standards to Employees with Disabilities, available at

http://eeoc.gov/facts/performance-conduct.html), appeal filed, (9th Cir. Nov. 25, 2015).

Knowledge of a knee injury and the need for diagnostic- or treatment-related doctor's

appointments do not, without more, inform the employer that the employee has work-related

limitations and thus needs an accommodation to perform the essential functions of his or her job. The duty to explore a reasonable accommodation begins "upon receiving notice of a connection between a work-related problem and a disability." Kelley, 2013 WL 6119229, at *6 (discussing Kimbro v. Atlantic Richfield Co., 889 F.2d 869 (9th Cir. 1989), and rejecting the plaintiff's position that Kimbro held that an employer must affirmatively investigate potential work-related limitations upon learning of an employee's disability).

As Kelley noted, the employer is not required to speculate as to the extent of the employee's disability or the desire for an accommodation. Id. at *6 (citing Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046-67 (6th Cir. 1998). Additionally, the court must distinguish between an employer's knowledge of a disability and the knowledge of a work-related limitation. Id. (citing Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 164 (5th Cir. 1996)). The "'ADA requires employers to reasonably accommodate limitations, not disabilities.'" Id. (quoting Taylor, 93 F.3d at 164). A particular disability may limit one employee and require a reasonable accommodation but the same disability may not limit another employee. Taylor, 93 F.3d at 164. Thus, "the ADA does not require an employer to assume that an employee with a disability suffers from a limitation." Id. Because "public policy dictates . . . that disabled employees are not limited in their abilities to adequately perform there jobs . . . it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom." Id.

Plaintiff's failure to notify Defendant of any actual limitations in performing his job is fatal to his claim. His limp is not enough because while it is suggestive of a disability, it is not necessarily suggestive of any limitations on his ability to perform the job. See Gardias v. Calif. State Univ., No. C09-02090 HRL, 2010 WL 3258615, at *2-4 (N.D. Calif. Aug. 17, 2010)

(employee who occasionally limped but was able to do his job, "albeit . . . a bit slower," could not sustain disability-based failure to accommodate and retaliation claims; presence of limp and employee's questions about what kind of accommodations the employer offered generally were insufficient to support claims).

Pellecer's comment about Plaintiff's being slow getting into the excavator is also not enough because, like the limp, it could suggest a disability but it does not reveal a limitation in his ability to perform the job.  It also provides no basis for the employer to know that a disability prevented Plaintiff from requesting a reasonable accommodation.  And, Plaintiff's occasional requests for rides from one part of a job to another is insufficient to put Defendant on notice that Plaintiff needed an accommodation.  Pl. Dep. 196-98.  Plaintiff indicates that this occurred "half a dozen" times.  Id. at 196.  He does not state whether he made the request of co-workers, supervisors, or superintendents.  He testified that he did not have a physical inability to walk, but the ride was more of a convenience when his leg hurt.  Id. at 197-98.  The one time he did not receive a ride when he wanted one, he did not tell anyone it was necessary because of his knee injury.  Id. at 198.  Sporadic requests for rides to unnamed workers without linking the ride request to a disability do not put an employer on notice of a need for reasonable accommodation.

The record establishes that Plaintiff did not request an accommodation.[9]  The record also establishes that Defendant did not know, or have reason to know, that Plaintiff experienced workplace problems because of a disability and that Defendant did not know, or have reason to

_____

[9]  While Plaintiff states that his requests for doctor's appointments were a request for accommodation, a doctor appointment is different in kind than adjustments to the actual performance of work.  And, as Kelley indicates, knowledge of the injury and knowledge of the need for doctor's appointments does not equate to knowledge of work-related limitations in the performance of work duties.

38 - OPINION & ORDER

know, that Plaintiff's disability prevented him from requesting a reasonable accommodation.  I

grant summary judgment to Defendant on Plaintiff's reasonable accommodation claim.

CONCLUSION

Defendant's motion for summary judgment [33] is granted.

IT IS SO ORDERED.

Dated this _____ day of _____, 2016

Marco A. Hernandez
United States District Judge

39 - OPINION & ORDER